IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| RUSTY LEE,                )<br>                                           )<br>       Plaintiff,            )<br>                                           )<br>   v.                                   )<br>                                           )<br>MICHAEL J. ASTRUE, Commissioner of Social  )<br>Security,                              )<br>                                           )<br>            Defendant.             ) | CV 07-1740-MO<br><br>OPINION AND ORDER |

MOSMAN, J.,

    Plaintiff Rusty Lee challenges the Commissioner's decision denying his application for disability insurance benefits under Title II of the Social Security Act. I have jurisdiction under 42 U.S.C. § 405(g). I AFFIRM the Commissioner's decision.

    Mr. Lee was hospitalized in June 1990 with viral encephalitis. This reportedly caused scar tissue in the left hippocampus of his brain and resulted in a complex partial seizure disorder. He was treated initially by Dr. Kho, but those records are not part of the case file. In November 2000, Mr.

1 - OPINION AND ORDER

Lee transferred care to Kevin Sullivan, M.D. Admin. R. 251-53. He worked until February 2003, when he was laid off. *Id.* at 71. He alleges he became disabled by his seizure disorder in May 2004. *Id.* at 64, 70.

The administrative law judge ("ALJ") applied the five-step sequential disability determination process set forth in 20 C.F.R. § 404.1520. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). The ALJ determined that Mr. Lee was unable to perform the work he has done in the past, but retained the residual functional capacity ("RFC") to perform other work that exists in the national economy. The court reviews that decision to ensure that proper legal standards were applied and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004).

Mr. Lee argues the ALJ improperly evaluated the evidence of his RFC and elicited testimony from the vocational expert ("VE") with assumptions that did not accurately reflect his functional limitations. Mr. Lee contends the faulty vocational testimony undermined the ALJ's conclusion that he retains the ability to work.

### I.     RFC Assessment

The RFC assessment describes the work-related activities a claimant can do on a sustained, regular and continuing basis, despite the functional limitations imposed by his impairments. 20 C.F.R. § 404.1545(a); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184. The RFC assessment must be based on all the evidence in the case record, and the ALJ must consider all allegations of limitations and restrictions. SSR 96-8p, 1996 WL 374184 * 5. Mr. Lee contends the ALJ assessed his RFC inaccurately because she improperly discredited his testimony and that of his wife and rejected the medical opinions of Kevin Sullivan, M.D., and Katherine Greene, Psy.D.

### A.   Credibility Determination

Mr. Lee alleged disability beginning in May 2004 due to a seizure disorder which began after he contracted viral encephalitis in 1990. *Id.* at 64, 70. He testified that he worked until he was laid off along with others in February 2003, due to cut backs by his employer. He collected unemployment benefits for approximately one year. *Id.* at 329-30.

Mr. Lee testified that his seizures are triggered by various sounds, including the buzzing of insects, the humming of tires on the road, and the sounds emitted by power tools and yard maintenance equipment. *Id.* at 334. His seizures usually involved a prodrome of sensation and peculiar symptoms of chewing objects, tearing at his clothing, smacking his lips, and loss of awareness. *Id.* at 338-41. He testified the seizures have gotten worse, do not always include a prodrome, and now seem to be several different kinds. *Id.* at 339. They have not included falling down or convulsions. *Id.* at 345. The seizures last from 3 to 5 minutes at the most. *Id.* at 346.

The ALJ accepted that Mr. Lee has a seizure disorder which makes it dangerous for him to work at heights, around work hazards, in a noisy environment or an environment where there are buzzing sounds, and to perform tasks that require him to balance. She limited Mr. Lee's occupational base to jobs in which an episode of 3 to 5 minutes of inattention would not be hazardous. *Id.* at 21. The ALJ did not accept that Mr. Lee had functional limitations in excess of her RFC assessment or that his seizures were sufficiently frequent and debilitating to prevent him from working.

In deciding whether to accept subjective statements, an ALJ must first determine whether the claimant has produced objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged. *Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir.

3 - OPINION AND ORDER

1996); *Cotton v. Bowen*, 799 F.2d 1403, 1407-08 (9th Cir. 1986). The ALJ did not challenge the existence of medical impairments that could produce some of the symptoms Mr. Lee alleged, but found his statements about the frequency of his seizures and the extent of the functional limitations they imposed not entirely credible. Admin. R. 25.

An ALJ may discredit a claimant's testimony regarding the severity of symptoms by providing clear and convincing reasons for doing so. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Smolen*, 80 F.3d at 1283. The ALJ must make findings that are "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995). The ALJ may consider objective medical evidence, the claimant's treatment history, daily activities, and work record, the observations of treating sources and third parties with personal knowledge of the claimant's functional limitations, the consistency of the claimant's statements, and any statements by the claimant that appear to be less than candid. *Smolen*, 80 F.3d at 1284; SSR 96-7p, 1996 WL 374186.

The ALJ considered these factors in her evaluation of Mr. Lee's credibility. She found it significant that Mr. Lee did not allege disability for 14 years after the onset of his seizure disorder, without any indication that his symptoms worsened in severity or frequency. She reasonably drew an adverse inference as to Mr. Lee's credibility from his ability to work full time until February 2003, and from the fact that he stopped work due to a lay off and not because his seizures made it impossible for him to perform his job. *See Bruton v. Massanari,* 268 F.3d 824, 828 (9th Cir. 2001)(Sufficient reasons for disregarding subjective testimony include stopping work for non-medical reasons instead of the allegedly disabling condition).

The ALJ found Mr. Lee's testimony that his seizures had worsened in frequency and intensity unsupported by his own reports to treating providers. In January 2003, before he allegedly became disabled by his seizures, Mr. Lee told Martin Salinsky, M.D., they typically occurred at a frequency of about one to three per month. Admin. R. 313-17. In March 2005, after the alleged onset of disability, he reported a typical frequency of about one to two per month. *Id.* at 226. In August 2006, he reported about two per month. *Id.* at 304. These reports do not suggest an increase in the frequency of seizures at the time disability allegedly began.

Furthermore, the ALJ discussed Mr. Lee's treatment history in detail and found he did not consistently report seizures with the frequency he claimed. She felt these records indicated his seizures responded to medication, although they were never fully arrested. When Mr. Lee established care with Dr. Sullivan, he reported his seizures had decreased in frequency and severity with Depakote. *Id.* at 251. After Dr. Sullivan started him on anti-convulsant medications, Mr. Lee did not have seizures for several months. *Id.* at 249-50. When they recurred briefly, Dr. Sullivan adjusted his medication and Mr. Lee did not have seizures between May and October 2001. *Id.* at 245-47. This became a continuing pattern of lengthy periods without seizures followed by a recurrence and then an adjustment in medication. In March 2003, Mr. Lee was without seizures on a combination of Depakote and Trileptal. *Id.* at 318. In April 2004, he remained seizure free without medication toxicity or side effects. *Id.* at 229. On May 3, 2004, he allegedly became disabled. Mr. Lee said he had several seizures around the alleged onset of disability, but after another adjustment in medications, they became very infrequent again. *Id.* at 225-28. In June 2006, Mr. Lee reported having seizures in the preceding month. *Id.* at 305.

Similarly, Mr. Lee did not report an increase in the severity of his symptoms over time. He reported new triggering sounds and subtle changes in the prodrome sensation preceding some seizures, but the record does not include reports of worsening symptoms. The ALJ drew an adverse inference as to Mr. Lee's credibility from the inconsistency between his testimony regarding worsening seizures and the treatment record which did not reflect increased frequency or worsening symptoms.

Mr. Lee argues the ALJ's decision is internally inconsistent regarding worsening symptoms. The ALJ found he could not perform his past work, which could suggest a decrease in his functional capacity. However, the ALJ's finding more reasonably suggests she found it was dangerous for Mr. Lee to have been driving and working around hazards without seizure precautions from the onset of his seizure disorder in 1990. The latter interpretation is entirely consistent with the ALJ's decision and the record as a whole.

The ALJ also found it significant that Mr. Lee lied to Dr. Kho during the course of his treatment. Mr. Lee told Dr. Kho he was seizure-free to protect his driving privileges. *Id.* at 251. The ALJ could reasonably draw an adverse inference as to a claimant's credibility when it is shown that the claimant is willing to lie to advance his purposes.

The ALJ also relied on Mr. Lee's reported activities to support his credibility determination. Mr. Lee testified that he works with wood, using power saws and other tools, but wears ear protection so the sounds emitted do not cause a seizure. *Id.* at 342. He testified that he told Dr. Sullivan he thought he would be a danger to himself or others in the workplace. *Id.* at 348-49. The ALJ could reasonably find it inconsistent that Mr. Lee believed he would be a danger in a work

6 - OPINION AND ORDER

setting without hazards or seizure-triggering sounds, but would expose himself to dangerous cutting tools and noises he claims induce seizures.

Mr. Lee contends the ALJ improperly discredited his testimony regarding his "unmanageable tendencies to erupt in violent outbursts while in a seizure, doing injury to himself or others." Pl.'s Br. 17. With this argument, Mr. Lee's attorney misstates his testimony. Mr. Lee testified that during a seizure he might reach over and punch someone. He admitted, however, that he had never punched or taken a swing at anyone during the 17-year history of his seizure disorder. Admin. R. 345. He testified that he had never injured anyone else or himself while having a seizure. *Id.* at 347. Mr. Lee explained that he told Dr. Sullivan he felt he would be a danger in the workplace simply because there was "always a possibility" that he could lose his temper and hurt someone or himself during a seizure. *Id.* at 348-49. This falls far short of testifying that he has an unmanageable tendency to erupt in violent outbursts. Mr. Lee's argument cannot be sustained because the specific testimony he claims the ALJ improperly rejected did not exist. The ALJ was not required to explain why she rejected this non-existent testimony. Her decision makes clear that she considered the testimony and concluded the suggestion that Mr. Lee might lose his temper and harm someone during a seizure was no more than speculation given his long seizure history without any such incidents.

The ALJ drew reasonable inferences from permissible factors in executing her responsibility for determining credibility. *Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir. 2005); *Edlund v. Massanari,* 253 F.3d 1152, 1156 (9th Cir. 2001). Even if the factual record could also support the interpretation Mr. Lee urges, the court must uphold the Commissioner's rational findings of fact. *Batson v. Comm'r of Soc Sec Admin,* 359 F3d 1190, 1193 (9th Cir 2004); *Andrews v. Shalala,* 53 F3d 1035, 1039-40 (9th Cir 1995); *Morgan v. Commissioner*, 169 F3d 595, 599 (9th Cir 1999). The

ALJ's decision provides an adequate basis for me to conclude the ALJ did not discredit Mr. Lee's statements arbitrarily. *Orteza*, 50 F.3d at 750. Accordingly, the ALJ's credibility determination must be affirmed.

### B.    Lay Witness Statements

Mrs. Lee testified that once during a seizure Mr. Lee seemed not to recognize her momentarily, doubled up his fist and advanced toward her in a threatening way. When she spoke to him reassuringly, he stopped and walked away. Although he did not become violent, this incident scared her. Admin. R. 356. Mrs. Lee testified that a similar incident occurred while Mr. Lee was hospitalized with viral encephalitis in 1990. Mr. Lee left his hospital room and advanced in a threatening way toward a man in the waiting room. Mr. Lee did not become violent, but walked away as if nothing had happened. *Id.* at 357-58.

Mrs. Lee testified that she thought Mr. Lee's employer let him go because he was moody, short-tempered, and tired due to his medications. *Id.* at 362-63. She admitted this was speculation and offered no reason to disbelieve her husband's testimony that the employer was reducing its workforce due to cut backs. *Id.* at 363-64.

Mrs. Lee testified that Mr. Lee's seizures progressively worsened beginning in 2001. She did not describe worsening symptoms, however, but indicated the seizures were triggered more easily by a variety of sounds. *Id.* at 364.

An ALJ must consider lay witness testimony concerning a claimant's ability to work. *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006). Lay testimony as to the claimant's symptoms or how an impairment affects the ability to work cannot be disregarded without comment. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996). If the ALJ wishes to discount

8 - OPINION AND ORDER

the testimony of a lay witness, he must give reasons that are germane to the witness. *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001).

The ALJ discounted two aspects of Mrs. Lee's testimony. The ALJ did not believe her speculative statement that Mr. Lee had been let go by his employer due to his seizure disorder or medication side effects. Admin. R. 24, 25. The ALJ found this inconsistent with Mr. Lee's testimony that his employer laid him off along with other employees in a reduction of their workforce due to cut backs. The ALJ also noted Mr. Lee's contemporaneous treatment records indicated no medical reason why he could not work. One month before Mr. Lee was laid off, Dr. Salinsky opined he was able to work full time despite his seizures. *Id.* at 314. After Dr. Salinsky changed Mr. Lee's medications in January 2003, Mr. Lee reported he was doing remarkably well. *Id.* at 318. Dr. Sullivan noted the seizures were fairly well controlled and Mr. Lee remained seizure free until he tried to discontinue one of his medications in December 2003. *Id.* at 229-34. In April 2004, Mr. Lee remained seizure free without medication side effects while taking a combination of Depakote and Trileptal. *Id.* at 229.

In addition to the foregoing reasons for disbelieving Mrs. Lee's statement, the ALJ indicated her statement appeared to be a dishonest attempt to obtain disability benefits. *Id.* at 25. Mr. Lee challenges this suggestion. Even if the record does not support the ALJ's suggestion of dishonesty, the record as a whole, including Mr. Lee's testimony and the contemporaneous medical records, support the ALJ's decision to discredit Mrs. Lee's opinion regarding the reason Mr. Lee stopped working.

The ALJ also discounted Mrs. Lee's statement that Mr. Lee's seizures progressively worsened beginning in 2001. *Id.* at 25. The ALJ relied on contemporaneous medical records

9 - OPINION AND ORDER

indicating his condition improved from the time he was working to the time his disability allegedly began. As noted previously, Mr. Lee's seizures were reported to be poorly controlled while he was working, but Dr. Sullivan indicated he was almost seizure free without side effects or toxicity during 2003.

The ALJ did not discredit any other aspect of Mrs. Lee's testimony. Mrs. Lee's description of the incident in which she felt threatened by Mr. Lee does not establish a pattern of violence or a likelihood that Mr. Lee might be dangerous in a work setting in which seizure precautions are observed. The event was an isolated incident in a 17-year history of seizures. Although Mr. Lee appeared threatening momentarily, he did not become violent. The ALJ could reasonably accept that Mrs. Lee accurately described the incident without concluding that Mr. Lee would be a danger to himself or others in a workplace without seizure triggers. Accordingly, the ALJ did not discount this aspect of Mrs. Lee's testimony and was not required to give reasons for doing so.

The ALJ properly considered Mrs. Lee's testimony and provided adequate reasons for discounting the aspects she did not believe. Accordingly, the ALJ's evaluation of Mrs. Lee's testimony is upheld. *Stout*, 454 F.3d at 1053; *Nguyen*, 100 F.3d at 1467; *Lewis*, 236 F.3d at 511.

### C.     Medical Source Statements

Dr. Sullivan began treating Mr. Lee in November 2000. As noted previously, he prescribed several anti-convulsant medications in various combinations to control Mr. Lee's seizures with limited success. By December 2002, Mr. Lee's seizures had responded temporarily to these medications, but had not been completely arrested and Dr. Sullivan described them as "poorly controlled." Admin. R. 236. He referred Mr. Lee to Dr. Salinsky, for an epilepsy evaluation.

In January 2003, Dr. Salinsky indicated Mr. Lee was able to work full time, but not drive. *Id.* at 314. He diagnosed a cryptogenic probable temporal lobe epilepsy with complex partial seizures. Dr. Salinsky recommended a trial of a different medication combination of Depakote and Trileptal, but noted the likelihood of success was not great based on the failure of prior medications to completely arrest Mr. Lee's seizures. *Id.* at 313-17. Despite this pessimism, in March 2003 Mr. Lee reported he had done remarkably well on the new combination of medications and had experience no seizures for a month. *Id.* at 318. One month later, Mr. Lee had only had one seizure when he neglected to take his medication. *Id.* at 234. In June 2003, Mr. Lee still had experienced no seizures despite trying to induce them with typical trigger sounds. *Id.* at 233. In September 2003, he remained seizure free. *Id.* at 232. In December 2003, Mr. Lee experienced seizures when he tried to discontinue Depakote, and the seizures stopped when he resumed the medication. He then tried to replace Trileptal with a different medication, but seizure activity resumed. By April 2004, just before the alleged onset of disability, he had resumed the combination of Depakote and Trilpetal and was again seizure free. *Id.* at 229. During 2004, Mr. Lee had seizures in May, October, and November. *Id.* at 227-28. In March 2005, Mr. Lee told Dr. Sullivan he continued to have seizures at a frequency of one or two per month, but only actually reported one seizure during the year, in April. *Id.* at 225.

On June 20, 2005, Dr. Sullivan completed a seizure questionnaire indicating Mr. Lee experienced seizures occurring at a variable frequency up to several times per month, precipitated by sounds such as music and buzzing noises. Dr. Sullivan indicated Mr. Lee's post-seizure symptom was confusion. He said Mr. Lee "can have bizarre and destructive behavior during a seizure, with no memory after." *Id.* at 282. Dr. Sullivan indicated Mr. Lee's seizures would be likely to disrupt

11 - OPINION AND ORDER

the work of coworkers. He opined Mr. Lee was "unable to work around equipment, chemicals, soldering iron, heights, etc." *Id.* at 284. In May 2006, Dr. Sullivan opined:

> I do not think he is ready to return [to employment] yet. His seizures can be characterized by peculiar activity, sometimes destructive toward himself or others, and his seizures are not yet under total control. I would therefore consider him a danger in the work place to himself and to others, and I do not feel he should return to work yet.

*Id.* at 306.

The ALJ accepted Dr. Sullivan's opinion that Mr. Lee's seizures were not under total control and that he could not work safely around the hazards Dr. Sullivan described. The ALJ did not give Dr. Sullivan's opinion that Mr. Lee's seizure disorder precluded employment significant weight, however. *Id.* at 26. An ALJ can reject a treating physician's opinion for clear and convincing reasons. *Thomas v. Barnhart*, 278 F.3d 947, 956-57 (9th Cir. 2002); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

Here the ALJ discounted Dr. Sullivan's disability opinion because the record as a whole showed that Mr. Lee was able to work despite his seizure disorder from 1990 until he was laid off for reasons unrelated to his functional limitations. In addition, there was no indication of a worsening of the functional impact of his seizure disorder at the time disability allegedly began. If anything, Mr. Lee's seizures became much less frequent after the treatment recommendations of Dr. Salinsky were implemented. Admin. R. 26.

Mr. Lee objects to the ALJ's finding that his seizures responded to the medication combination Dr. Salinsky recommended. He points to Dr. Salinsky's warning that the likelihood was not great that the medications would control his seizures given that other medications had failed. The record reveals that, despite Dr. Salinsky's pessimistic prediction, Mr. Lee's seizure disorder did

12 - OPINION AND ORDER

respond to the combination of Depakote and Trileptal. While using this combination of medications Mr. Lee's seizures were very infrequent, although not completely arrested.

The ALJ also noted that Dr. Sullivan relied primarily on Mr. Lee's subjective claim of potential violent behavior causing a danger to himself and others. *Id.* Mr. Lee admitted in his testimony that he suggested this limitation to Dr. Sullivan. *Id.* at 348-49. As noted previously, the ALJ did not believe Mr. Lee's statement that he is a danger to himself or others because the record did not support a history of violence. Mr. Lee admitted he had never hurt himself or anyone else during a seizure and his statement was based on speculation that he might lose his temper in unforseen future circumstances. *Id.* The ALJ concluded the absence of violence in Mr. Lee's seizure history was a better predictor of his future behavior than speculation about violence that could happen if he lost his temper. Dr. Sullivan's disability opinion was entitled to no more weight than Mr. Lee's statements upon which it was based. An ALJ is entitled to reject a treating physician's opinion that is premised primarily on subjective complaints that the ALJ properly finds unreliable. *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).

Dr. Greene performed a consultative evaluation in June 2005, to assess Mr. Lee's cognitive functioning. Her evaluation was based on an interview of Mr. Lee and his wife and results from a battery of tests. On standard intellectual testing, Mr. Lee scored in the low average range for most categories of cognitive function, including IQ, achievement, speech and language, general memory, and visual perception . Admin. R. 289-90. His test scores for attention and concentration, executive functioning, and fine motor speed and coordination were in the borderline range. *Id.*

In July 2005, Dr. Greene prepared a mental residual functional capacity assessment worksheet. She indicated Mr. Lee was not impaired in his ability to understand, remember, and carry out short simple instructions. *Id.* at 296. She found Mr. Lee markedly impaired in numerous work-related abilities, including maintaining attention and concentration for extended periods, sustaining an ordinary routine without special supervision, working with others without being distracted, and completing a normal work schedule at a consistent pace without interruptions from psychological symptoms. *Id.* at 296-97.

The ALJ gave little weight to Dr. Greene's assessment of mental limitations beyond those addressed in the residual functional capacity. The ALJ pointed out that Dr. Greene's own report indicated Mr. Lee's cognitive functions were generally in the low average range. In addition, she noted that after the brain scarring that resulted from his 1990 encephalitis episode, Mr. Lee was able to continue working full time at a saw mill until he was laid off, then obtain a two-year degree in electrical technology, and then work full time as an electrical technician until he was laid off again in 2003. The ALJ reasonably found these accomplishments inconsistent with Dr. Greene's findings of marked impairment in numerous basic mental work functions. *Id.* at 26.

The ALJ also pointed out that Dr. Greene relied extensively on the subjective reports of Mr. Lee and his wife. This was necessary because Dr. Greene did not have a treatment relationship or treatment records from Dr. Sullivan or any other basis from which to establish Mr. Lee's history. Dr. Greene's conclusions are no more reliable than the subjective statements upon which they were based and the ALJ properly concluded Mr. Lee and his wife were not particularly credible. *Fair*, 885 F.2d at 605; *Tonapetyan*, 242 F.3d at 1149.

The ALJ also indicated the progress notes in the record made no reference to the areas of marked impairment Dr. Greene found. It would be reasonable to expect Mr. Lee or his wife to mention such severe deficits to a treating source and to expect Dr. Sullivan to observe some indication of such deficits. In fact, Mr. Lee did not even allege any of the mental deficits Dr. Greene found as a basis for his claim of disability.

The ALJ's reasoning for giving diminished weight to the opinions of Drs. Sullivan and Greene is clear and convincing and supported by substantial evidence in the record as a whole. *Thomas,* 278 F.3d at 956-57; *Magallanes,* 881 F.2d at 751. The decision makes clear that the ALJ considered all the medical source statements in context with the record as a whole and resolved inconsistencies in a reasonable manner. She explained the weight given to the medical opinions, and where necessary gave legally sufficient reasons for discounting the portions that were not reasonably consistent with the record as a whole. Her reasoning is rational and supported by substantial evidence and will not be disturbed. *Batson*, 359 F.3d at 1193; *Andrews,* 53 F.3d at 1039.

### D.   Other Limitations

Mr. Lee contends the ALJ failed to consider that he is very tired after having a seizure and that his medications sometimes leave him drowsy. He contends these limitations may make it impossible for him to sustain work on a regular basis without unscheduled breaks or absences.

Mr. Lee bears the burden of establishing his impairments. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995). The ALJ's written decision demonstrates that she considered all the evidence in the case record and all the allegations of limitations and restrictions. She did not find support in the record for the additional limitations from post-seizure fatigue or medication side effects. Mr. Lee does not cite evidence establishing additional limitations in work-related functions attributable to

post-seizure fatigue or medication side effects. Accordingly, Mr. Lee failed to satisfy his burden of proof on this issue.

## II. Vocational Evidence

At step five of the decision-making process, the Commissioner must show that the claimant can perform work which exists in the national economy. *Andrews*, 53 F.3d at 1043. The Commissioner can satisfy this burden by eliciting the testimony of a VE with a hypothetical question that sets forth all the limitations of the claimant. *Id.; Osenbrock v. Apfel*, 240 F.3d 1157, 1163-65 (9th Cir. 2001).

Mr. Lee challenges the vocational evidence on two grounds. First, he contends the ALJ elicited vocational testimony from the VE with a hypothetical question that did not contain all of his limitations and restrictions. He contends the ALJ should have included additional limitations based on the asserted errors discussed previously in this opinion. His arguments in support of those support of those errors cannot be sustained for reasons already given. The ALJ considered all the evidence and framed her vocational hypothetical question based on the limitations supported by the record as a whole. An ALJ is not required to incorporate limitations based on evidence that she properly discounted. *Batson*, 359 F.3d at 1197-98; *Osenbrock*, 240 F.3d at 1164-65.

Mr. Lee's second challenge arises from the ALJ's attempt to address evidence that Mr. Lee developed a slight hand tremor as a side effect of his treatment with anticonvulsant medications. During a neurological examination in May 2006, Dr. Sullivan noted a "slight tremor of his fingers when his arms are outstretched." Admin. R. 306.

The ALJ attempted to address this in her RFC assessment by finding Mr. Lee "cannot perform tasks requiring significant fine motor actions." *Id.* at 21. In her vocational hypothetical

question, the ALJ instructed the VE to exclude jobs "requiring frequent — oh, let's see — fast motor dexterity." *Id.* at 367. Mr. Lee contends the ALJ's hypothetical limitation did not accurately reflect her RFC assessment. He contends the hypothetical question precluded only fast fingering while the RFC assessment precluded all significant fingering. Mr. Lee argues, if he cannot perform any significant fingering, he cannot meet the work requirements of any of the jobs identified by the VE.

The ALJ's RFC assessment could have provided a clearer statement of the vocational limitation resulting from Mr. Lee's hand tremor. The difference in wording between the RFC assessment and the hypothetical assumption given to the VE is unnecessarily troubling. I conclude, however, that the ALJ's description to the VE was adequate. The evidence in the record does not support the interpretation that Mr. Lee is unable to perform any significant fingering. The exclusion of fast and frequent fingering appears to reasonably capture, and perhaps overstate, Mr. Lee's limitation from his slight tremor when his arms are outstretched.

The parties agree that the exclusion of frequent fingering precludes two of the occupations identified by the VE, but that the third occupation she identified, cleaner/polisher, requires only occasional fingering. Mr. Lee argues the ALJ's step five conclusion is undermined by *Lounsburry v. Barnhart*, 468 F.3d 1111, 1117 (9th Cir. 2006), in which the court held that one occupation did not constitute a "significant range of work" as that phrase is used in Rule 202.00(c) of the Medical Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. The court held Lounsburry was disabled because the ALJ identified only one occupation to which he could adjust. *Lounsburry*, 468 F.3d at 1117-18. Mr. Lee argues *Lounsburry* compels a finding that he is disabled because the VE identified only one occupation not precluded by his fingering limitation.

This argument cannot be sustained because *Lounsburry*'s definition of "significant range of work" pertains only to cases analyzed under Rule 202.00(c) of the Medical Vocational Guidelines. *Tommasetti v. Astrue*, 533 F.3d 1035, 1043-44 (9th Cir. 2008). The ALJ did not apply the Medical Vocational Guidelines in this case, because she found Mr. Lee's ability to perform the full range of work at any given exertional level compromised by nonexertional limitations. Admin. R. 28. SSR 83-11, 1983 WL 31252 * 2; SSR 83-14, 1983 WL 31254 * 1.

In the circumstances of this case, "work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements" which the claimant is able to meet given his RFC and vocational factors of age, education and work experience. 20 C.F.R. § 404.1566(b). The VE testified that a significant number of jobs in the occupation cleaner/polisher existed in Oregon and in the national economy. Admin. R. 368. Accordingly, the ALJ's step-five conclusion is supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, the ALJ's decision is based on correct legal standards and supported by substantial evidence. The Commissioner's final decision is AFFIRMED.

DATED this  20th  day of   March  , 2009.


/s/ Michael W. Mosman
Michael W. Mosman
United States District Judge